Good morning, Your Honors. May it please the Court, John Higginbotham, Assistant City Attorney for the City of Corona, on behalf of the Appellant Police Officers David Dobson and Blair Montalbano. I'd like to reserve two minutes. I'd like to focus my remarks today primarily on the United States Supreme Court's landmark decision in Saussure v. Katz, in particular on the second prong of the Saussure analysis, which is whether the right which the police officers allegedly violated was clearly established at the time of the incident. Two key principles emerged from Saussure, which remain good law today. The first is that the clearly established right inquiry must be undertaken in light of the case's specific context, in light of the particulars, not as a broad general proposition. As the Court in Saussure said, it is, quote unquote, not enough to cite Graham v. Connor for the general proposition that excessive force violates the Fourth Amendment, or as Anderson and other previous cases say, that the right to be free from false arrest violates the Fourth Amendment. That is not enough. The right must be clearly established in a more particularized and a more relevant sense. The contours of the right must be sufficiently clear that a reasonable police officer would know that what he is doing violates the law. Second, the qualified immunity inquiry is distinct from, and not merely duplicative of, the underlying false arrest and excessive force inquiries under Graham v. Connor and other cases. The qualified immunity inquiry, unlike those other inquiries, recognizes that officers can make reasonable mistakes and they can still be immune if their mistake was reasonable, if they did not knowingly violate the law, or if they were not plainly incompetent. The district court in this case, we submit, paid lip service to those principles, but did not meaningfully or properly apply them. But she, she, she filed a very thorough and thoughtful analysis of the claims for qualified immunity. How can you say that she just paid lip service to what you just said? Well, here's why, Your Honor. Because Saussure said that you can't just cite Graham v. Connor and say excessive force violates the Fourth Amendment. And that is exactly what the district court did. You can't just cite Graham v. Connor and say the allegation, you know, she went through, she analyzed it. Your Honor, she framed the rule as follows, with respect to the false arrest issue, and this is at page 30 of her ruling. Quote, it is beyond question that the right not to be arrested without probable cause was clearly established on the date Onyenwe was arrested, end quote. And she applied it to the particular charge that he was arrested for, which was public intoxication. And this is, and this is the way she did it. It basically boiled down to two sentences on page 31 of her opinion and in footnote 105. If Onyenwe's version of the incident is believed, he was not inebriated and had no interaction with the officers from which they could reasonably inform the mistaken opinion that he was. Assuming Montalbano and Dobson knew that Onyenwe was not inebriated at the time they arrested him, they could not have reasonably believed that they had probable cause to arrest him. That's a flawed analysis. It's a flawed statement of the rule and it's a flawed analysis. When you do a qualified immunity analysis and there are competing versions of what took place, you, you take the version of the plaintiff. You do, insofar as it goes. And the plaintiff is certainly entitled. No, you take, you take the version of the plaintiff and you assume that those facts are true and you ask whether or not those facts, a reasonable fact finder could find a violation of the constitutional right that's asserted. And that's what she did here. I don't disagree with that in the abstract. The plaintiff is entitled to that. But what the plaintiff is not entitled to is to only throw out two or three facts, not address most of the other key facts, not rebut what the officers have said on numerous other points. And to the extent there's a conflict in the evidence, you know, sometimes you can't really make a real qualified immunity determination until those facts are resolved by a trier of fact. And that's certainly true, Your Honor. I don't disagree with that. But what happened here is Onyenwe basically just says, I wasn't drunk. I wasn't wandering around the parking lot with the two other people. And I didn't talk to the officers before they arrested me. But he doesn't address the numerous other points that they relied on. What are the numerous other points? The numerous other points are, first, the officers went into this knowing that there had just been a fight at the bar in which pepper spray had been used. They arrived on the scene and were told by the security guards that these were the three people who had worn out their welcome. I don't think that we can assume that. That's contrary to what they say in their police reports and in everything else that's cited, their depositions. They never say a word about being told. They say that they observed it themselves. Your Honor, Montalbano says it in his police report. In fact, that's in the very beginning of the narrative in his police report. Where? He specifically says in the first two pages. Tell me where in the police report. There's only one page of narrative of the police report, and it's in the very top. Where does it say I was told rather than I observed? In the very first two paragraphs. He says that... Tell me where in the first paragraph. Read it to me. This is at page ER-168. Yes. And see where it says I was told by the security guards about Onaway. Right. In the second paragraph of the narrative, he says, Due to the large number of party goers, Mill Creek Security requested that PDs stand in the parking lot until a second group of unruly suspects left the area. Security advised that SU-01, Henry... No, security advised... Where's the that? I don't have that on my... Is that what it says? Maybe this isn't reprinted, but security advised that... He advised Henry Nowacki, Hallie Odesumny, and Emmanuel Onyenwe that they were no longer welcome on the property and that it was time to leave. Yeah. That's what... But that's not as if he told the police anything. That's a report that the security advised these people that they were no longer welcome. In the presence of the police officers. I mean, how else would the police officer have known that if he didn't hear the security guards say it? Did he just make it up? I don't think that's a fair assumption. The security guards were advised when they got there that these people had worn out their welcome. And they proceeded to observe the situation... It doesn't say they advised the police that they had told these people to leave. This is a statement about what happened. Not that they were told that the police were told this before the arrest. Your Honor, I think, to be fair to the officers, I mean, I think that's sort of parsing the words here. I mean, both... In their depositions, they also say that they observed all of this. They did. Okay. They say they observed something. And he says those things didn't happen. Well, he doesn't say those things didn't happen. He just says he wasn't drunk and he wasn't wandering around with them. That's what he says. He doesn't say he wasn't staggering around. He doesn't say he didn't have bloodshot watery eyes. Yes, he does. He says he didn't have bloodshot watery eyes. And he said he wasn't drunk and he wasn't staggering around. You know, Your Honor, I must have not heard that in his deposition that I took. I mean, I don't recall him ever saying anywhere that he wasn't staggering around or wandering around or walking... He got in his car. He got there and he eventually got in his buddy's car. He eventually did. And the officers say they had 15 to 20 minutes to observe him before they pulled the trigger and made the arrest. He can't even account for his time. I asked him both when did you get there and how long were there. He couldn't answer either question. When he testified about the bloodshot eyes, it was that he broke down and was crying in the ride from the bar to the police station. He does say that. He does say that. And we have several other officers that say that he had watery eyes. And he testified that he hadn't been drinking before he showed up, that he'd just gotten off work. Sure. He did say that. But we take that as true. You take as true that that is what he says, sure. But you can't take as true that the officers knew that. And you evaluate whether a reasonable trial fact could believe that at trial and conclude that they lacked probable cause. And that's all Judge Morrow did. Your Honor, I'll spend the last couple minutes that I have talking about the excessive force claim. I repeatedly asked Mr. Onyenwe in his deposition about the so-called slamming against a car, the so-called kicking. He repeatedly, repeatedly, in response to a variety of different framings of the question, stated that he could not recall any force by Montalbano, could not recall any force by Dobson, could not recall any force by anyone the entire time that entire night. It is his testimony alone on which he's relying to establish an excessive use of force. If he can't remember it, he has no evidence. And even if what he said was true, he admitted that he was resisting getting out of the car. If that's the case, and he admitted that it was, pulling him out of the car and pushing him up against the side of the car to handcuff him. I don't recall what he said that he admitted, that he resisted coming out of the car. He admitted that he was told to get out of the car and that instead of getting out, he started arguing with Montalbano. You said resisting. I think that is resisting. Okay. If you don't get out of the car, when the police tells you to get out of the car, you're resisting. He was put in handcuffs. The police had a right to put him in handcuffs. Penal Code 835 gives officers the right to use some degree of force to effectuate an arrest and to overcome resistance. At a minimum, the use of force claim ought to be dismissed. Thank you. Thank you, Captain. Thank you, Captain. May it please the court to take a contest for Plaintiff Emmanuel Onyengwe. I think the issue about the, if I address the issue about the excessive force, Onyengwe did testify that when the police officers asked him to get out of the car, they simultaneously yanked him out of the car, slammed him on the car, and kicked him. He was very vehement with regards to that testimony. What we have is that the defense were just cherry-picking portions of the transcript without putting it in context. Counsel, let me ask you this. Because this is at a summary judgment stage and you've got a claim for qualified immunity, we give your client the benefit of a doubt, if you will. But your opposing counsel says that your client couldn't remember any use of excessive force. Is he correct in that? He's not correct because Onyengwe did testify that they slammed him, yanked him out of the car, and slammed him against the car and kicked him. And I gather your position would be that in light of what your client said in that portion of the evidence, that the contrary evidence that the city has simply points out that there's a material issue of fact and it needs to go to trial. Is that correct? That's correct, Your Honor. So unless the court has additional questions on this, I think it's pretty clear that we've met our burden at that stage. And the issues that he's addressing were very well articulated in our briefs, and I could see that the questions were coming from our briefs. Counsel, in his deposition, your client at one point said, did he tell you to get out of your car? Yes. Did you immediately comply? I don't recall. I don't think so. You don't think so? No. Is that when he opened the door and pulled you out? Yes. I think what counsel's referring to is that when your client was asked, did you immediately comply, he said, I don't recall. I don't think so. Well, I think subsequently it was a further question also where he was asked the sequence again. He said, when they asked me to get out of the car, before I could respond, they opened the car door and yanked me out of the car. And that was when the excessive force claim starts. I don't recall, but subsequently, when a subsequent question was asked regarding that, he said, yes, they did not even give me time. It wasn't like they gave, it was something that happened, get out of the car, and simultaneously they yanked me out of the car and slammed me. So it wasn't, yes, there was an initial response. I don't recall. But subsequently, he said, when that question was posed a second time or in a different form, he said, I was not given the time to respond. They opened, they said, get out. It's not like I was given a few seconds to react. He said, get out of the car, open the door, and at the same time, you're yanking, you're yelling instructions at Mr. Onyengwe, and at the same time, you're grabbing him, not giving him time to even react. If he was said, get out of the car, get out of the car, it was something that was said one time. Thank you. Thank you. All right. You have 14 seconds. I'll make the most of it. Your Honor, you can't create a tribal issue of fact by contradicting yourself. You can't create a tribal issue of fact when you don't address the fact and the only evidence is from the other side. So this is a guy who was not harmed. He's admitted he wasn't harmed. The police were not plainly incompetent. They didn't knowingly violate the law. Thank you. Is what I read, what you were referring to, is that when you said that he didn't know whether he was pulled out of the car or whether... Your Honor, we addressed that at several different points in his deposition, and he admitted that when Montalbano asked him to get out of the car, he responded, whoa, whoa, what are you doing, why, why, and he got into an argument with him about why he was being arrested. So, I mean, he was ambiguous as to how many times he was asked to get out of the car. Our officer said it was four to six times. He admitted it was at least once and that he got into an argument before he was pulled out. But what he didn't remember was not what you said before. He didn't remember what, you know, when and where it was asked. He didn't fail to remember that he had been pulled out of the car and slammed against the car, according to his testimony, right? Well, when I'd ask him about that in detail, he couldn't recall. When I'd ask him, tell me about it, he couldn't recall. When I'd ask him, did Montalbano use excessive force, he couldn't recall. I thought he clearly testified that he was pulled out and slammed against the car. You're saying he didn't say that? No, I'm not saying he didn't say that. I'm saying when I tried to follow up on with him on what that meant, on what that meant, what kicking meant, what slamming meant, it was routinely, I don't recall, I don't recall, I don't recall, over and over again. He couldn't recall what anybody did at any time. It was all vague generalities. And you don't get to abstractly go from generalities to specifics. You get inferences. You don't get to go from generalities to specifics. And we have to be able to test what he's saying. If he can't support it in his deposition, if he doesn't recall, and his is the only testimony, there's no conflict in the evidence. Thank you, Your Honor. Thank you, counsel. Thank you. The case is here. It will be submitted.
judges: Reinhardt, Paez, M. Smith